WHEATON MOOSE LODGE NO. 1775 ET AL. *v.*
MONTGOMERY COUNTY, MARYLAND

[No. 602, September Term, 1978.]

*Decided February 8, 1979.*

The cause was argued before MORTON, WILNER and COUCH,
JJ.

*Garland E. Lowe* for appellants.

*Sue Levin, Assistant County Attorney for Montgomery
County,* with whom were *Richard S. McKernon, County*

*Attorney,* and *Richard E. Frederick, Deputy County Attorney,* on the brief, for appellee.

WILNER, J., delivered the opinion of the Court.

The Montgomery County Council (sitting as the District Council for the Maryland-Washington Regional District) rejected appellant's [1] application to rezone certain property from R-60 (one family, detached residential) to C-3 (highway commercial). The Circuit Court for Montgomery County affirmed that decision, and appellant has appealed.

Appellant states the "question presented" in this appeal as whether the action of the County Council was "arbitrary, capricious, discriminatory and confiscatory of Appellant's rights . . . by depriving it of its property without due process of law". It breaks this rather general issue down into three subsidiary questions: (1) whether potential traffic problems standing alone were sufficient to deny the application; (2) whether, because C-3 is a "floating" zone, appellant was required to show that all permitted uses in that zone were compatible with the surrounding neighborhood; and (3) whether there was sufficient evidence to render the conclusions of the authorities fairly debatable. We shall consider appellant's contentions in the context of the three subsidiary questions upon the premise that the resolution of them will also resolve the broader "due process" claim.

Under the Montgomery County Zoning law, a C-3 zone is a "floating", or "non-Euclidian" zone; and a great deal of controversy in this case concerns the characteristics of and the procedural and substantive requirements for obtaining

---

1. The owner of the property is (or was at the time of the application) Wheaton Moose Lodge No. 1775. The application for rezoning was filed by Simplex Land, Inc., a contract purchaser of the land. During the latter part of the proceedings (after the matter had been remanded to the District Council by the Circuit Court), Gerald Goldberg was substituted for Simplex Land, Inc., as both contract purchaser and applicant. So far as we are able to determine, Mr. Goldberg and Wheaton Moose Lodge are the real parties currently in interest. For purposes of simplicity, however, in this Opinion we shall use the term "appellant" in the singular as referring to Simplex for the period of time that it was the applicant, and thereafter to Goldberg. As used in the *mandate,* the plural term "appellants" refers to and includes all parties appellant.

such zoning. It may be helpful, therefore, to consider initially what a "floating" zone is and how it differs from a "Euclidian" zone.[2]

## "Euclidian" and "Floating" Zones

The traditional zoning law divides the community into specific, territorial districts and prescribes the uses that are permitted (or not permitted) in each district. The boundaries of these districts are fixed by law, usually by reference to a map. Thus, in comprehensive zoning, every square foot of the community is within some fixed zone and is subject to the predetermined set of land use restrictions applicable to that zone. This is "Euclidian" zoning,[3] and, until fairly recently, it was the only type of zoning that the law countenanced.[4]

When the first zoning ordinances were enacted some 60 years ago, "Euclidian" zoning was a practical method of categorizing land uses in terms of their relative offensiveness to each other, and of protecting existing uses within a community from those which the law declared to be discordant and harmful to them. With the constitutional limitations placed upon "spot" zoning, however,[5] this type of fixed-district zoning suffered from a rigidity that became increasingly apparent as rural and suburban areas began to undergo extensive and rapid development in order to accommodate the outward migration following World War II. At the same time that the exodus to the suburbs created a greater demand there for multi-family dwelling units and

2. For an excellent treatise on this subject, see *Non-Euclidean Zoning: The Use of the Floating Zone,* Russell R. Reno, 23 Md. L. Rev. 105 (1963); also *Zoning Change: Flexibility vs. Stability,* Herbert Goldman, 26 Md. L. Rev. 48, 57 (1966); 2 *American Law of Zoning,* Anderson, 2d ed., §§ 11.06, 11.07.

3. The term "Euclidian" comes not from the ancient Greek mathematician (at least not directly), but rather from the case of Euclid v. Ambler Realty Co., 272 U. S. 365 (1926), in which the Supreme Court first approved, against Constitutional challenge, a local zoning ordinance of the type described above.

4. *See, for example,* Ellicott v. City of Baltimore, 180 Md. 176, 181 (1942), quoting from a California case: "The whole value of zoning lies in the establishment of more or less permanent districts, well planned and arranged." *Also* Heath v. M. & C.C. of Baltimore, 187 Md. 296, 305 (1946); Md. Annot. Code (1957 ed.) art. 66B, §§ 2, 4.

5. *See, for example,* Cassel v. City of Baltimore, 195 Md. 348 (1950); Huff v. Bd. of Zoning Appeals, 214 Md. 48 (1957).

nearby commercial and industrial enterprise necessary to provide convenient shopping and employment opportunities, more sophisticated design and planning techniques made many of these previously discordant uses more compatible with a residential setting. Careful land use planning thus made possible the location of aesthetically pleasing commercial establishments and garden-type apartment developments in close proximity to residential areas. But, under "Euclidian" zoning, the process for achieving this planned balance became quite cumbersome, especially when dealing with the planned development of rather large areas.

To resolve some of the impediments arising from the inflexibility of fixed-district "Euclidian" zoning, municipal planners experimented with a number of new techniques, one of which was the concept of the "floating" zone. This consists of a prescribed set of permissible land uses that are not attached, in advance, to any particular geographic district, but are, instead, permitted to "float" over the entire area until located upon specific property at the petition of the property owner. The Court of Appeals described the difference this way in *Bigenho v. Montgomery County*, 248 Md. 386, 391 (1968): [6]

> "A floating zone is differentiated from a so-called 'Euclidean' zone, in that while the latter is a specific area defined by boundaries previously determined by the zoning authority, the former has no such defined boundaries and is said to 'float' over the

6. *See also* Reno, *supra,* 23 Md. L. Rev. 105, 107:

"In recent years a new device in zoning has developed which provides the machinery for the establishment of small tracts for use as a shopping center, a garden apartment or a light industry in accordance with a comprehensive plan for the entire municipality, and at the same time leaves the exact location of each tract to be determined in the future as demand for a shopping center, a garden apartment or a light industry develops in a specific area. This device is the creation of special use districts for these various uses, which at the time are unlocated districts, but which can be located by a petition of a property owner desiring to develop his specific tract for one of these special uses. Such unlocated special zoning districts are popularly referred to as 'floating zones', in that they float over the entire municipality until by application of a property owner one of these special use zones descends upon his land thereby reclassifying it for the special use."

entire area of the district or zone where it may eventually be established.

"The floating zone is different from the establishment of an Euclidean zone in that it is initiated on the instigation of a land owner within the district rather than that of the legislative body."

Following the lead of the New York Court of Appeals in *Rodgers v. Village of Tarrytown,* 96 N.E.2d 731 (1951), the Maryland Court of Appeals first sustained the "floating" zone concept against an attack that it constituted illegal "spot" zoning in *Huff v. Bd. of Zoning Appeals,* 214 Md. 48 (1957). Without ever using the term "floating zone", the Court considered the unlocated zone at issue before it to be "analogous to a special exception" and thus concluded, at page 62:

"[T]he rules which are applicable to special exceptions would apply, not the general rules of original error or change in conditions or the character of the neighborhood, that control the propriety of rezoning. This is because, as in the case of a special exception, there has been a prior legislative determination, as part of a comprehensive plan, that the use which the administrative body permits, upon application to the particular case of the specified standards, is *prima facie* proper in the environment in which it is permitted. This prior determination and the establishment of sufficient standards effectively refute the claim of improper delegation of legislative power."

This approach has been reiterated and followed by the Court of Appeals on a number of subsequent occasions. *See Costello v. Sieling,* 223 Md. 24 (1960); *Beall v. Montgomery County,* 240 Md. 77 (1965); *Bujno v. Montgomery Co. Coun.,* 243 Md. 110 (1966); *The Chatham Corp. v. Beltram,* 243 Md. 138 (1966); *Board v. Turf Valley,* 247 Md. 556 (1967); *Bigenho v. Montgomery County, supra,* 248 Md. 386. In each of these cases, the Court specifically reaffirmed the analogy to a

special exception. In *Bigenho,* for example, at page 391, it concluded that:

> "[T]he floating zone is subject to the same conditions that apply to safeguard the granting of special exceptions, *i.e.,* the use must be compatible with the surrounding neighborhood, it must further the purposes of the proposed reclassification, and special precautions are to be applied to insure that there will be no discordance with existing uses."

## The C-3 Zone

The characteristics, and conditions, of the C-3 zone are set forth in the Montgomery County Code, §§ 59-C-4.71 through 59-C-4.77.[7] Section 4.71 describes the purpose of the C-3 zone thusly:

> ". . . It is the intent of this zone to provide a method for the orderly grouping and spacing of commercial development on properties which abut or front on, and have access to, heavily travelled major highways with a planned or existing pavement of at least six lanes, or on properties which are recommended for such zoning on approved and adopted master plans or which are adjacent to properties previously or concurrently zoned C-3. This zone is intended to provide sites for commercial activities that may require large land areas and do not depend upon adjoining uses for reasons of comparison shopping and pedestrian trade; and sites for commercial facilities which are related to the traveller and highway user. At the same time, it is the intent that the frequency, design and location of points of direct access to the highway be controlled by restricting development to service road access, thereby minimizing interference with through traffic

---

7. These references are to the 1972 Code, as amended through June, 1978. The law in effect at the time the relevant administrative proceedings took place was substantially the same as it is now, although the Code references were different.

movements. The fact that an application complies with all specific requirements and purposes set forth herein shall not be deemed to create a presumption that the application is, in fact, compatible with surrounding land uses, and, in itself, shall not be sufficient to require the granting of any application."

Section 59-C-4.0, dealing with land uses within all the commercial zones, sets forth the permissible uses within the C-3 zone. There are 54 such uses (plus 7 more permitted by special exception) ranging from newspaper and printing shops to a variety of automobile services (parking lots and garages, tire and parts stores, indoor and outdoor sales, repairs, car washes) to bowling alleys to drive-in banks to golf driving ranges to funeral parlors to restaurants (including drive-ins) and theatres. *Gasoline stations (automobile filling stations) are permitted only by special exception. See* former Code (1972), § 59-58 (C); current Code, § 59-C-4.0 (p. 1766).

Sections 59-C-4.72 through 4.76 prescribe what are termed "Development Standards" for the C-3 zone. These relate to building height, setbacks, green area, roads, and off-street parking. Section 59-C-4.77, captioned "Development Procedure" states that the procedure for *site plan approval* shall be as set forth in division 59-D-3.

## The Record in this Case

On May 31, 1972, appellant filed its application for a local map amendment to the county zoning ordinance, by which it proposed to have a 20,000 square foot lot at the southwest corner of Georgia Avenue and Weisman Road reclassified from R-60 to either C-2 or C-3. The application did not specify (and was not required to specify) any particular use that was to be made of the property, and no indication was given on the application that the ultimate desired use would or might require a special exception.

In accordance with local procedure, the matter was advertised, and set for hearing on October 4, 1972. Prior to the scheduled hearing, the technical staff of the

Maryland-National Capital Park and Planning Commission and the county planning board submitted a report to the Hearing Examiner recommending that the application be denied for the reasons that (1) the proposed reclassification to either C-2 or C-3 would be contrary to the Kensington-Wheaton Master Plan, (2) it would jeopardize the "well-established residential character of the neighborhood", (3) there was an insufficient change in the neighborhood to warrant the more intensive commercial development allowed under C-2 or C-3 zoning, and (4) the reclassification would not comply with the "stated and implied purpose" of the C-3 zone. No one appeared in opposition to the application at the hearing. For some unexplained reason, however, appellant asked permission to withdraw its application without prejudice. The District Council denied this request and remanded the case back to the Hearing Examiner to conduct another hearing.

Upon remand, a second hearing was scheduled, and held, but for personal reasons, appellant temporarily lost interest in the matter, and, as a result, failed to comply with the required pre-hearing procedures and did not attend the hearing. Indeed, no one representing appellant attended the hearing. The only evidence in the case, therefore, consisted of the aforementioned reports from the technical staff and the planning board; and for that reason, the Hearing Examiner recommended that the application be dismissed with prejudice. The District Council followed that recommendation and, on February 20, 1973, dismissed the application. Pursuant to a request from appellant, however, the Council reconsidered that resolution, and that matter was once again referred back to the Hearing Examiner.

The Examiner conducted another hearing (the third) on May 21, 1973, which opened with appellant's announcement that it was withdrawing its request for C-2 zoning, and would proceed solely upon the request for C-3 zoning. One witness appeared in opposition — Alfred Blumberg, of the Maryland-National Capital Park and Planning Commission, who testified with respect to the technical staff and planning board report. Most of Mr. Blumberg's testimony amounted

merely to a reaffirmation of what was contained in the staff report (which was admitted into evidence), although he acknowledged that (1) his fears about the difficulty of making turns to and from the northbound lane of Georgia Avenue (one of the concerns expressed in the report), arose from his personal observations rather than a formal traffic study, and (2) the conclusion in the report that commercial development of the site would jeopardize the residential character of the neighborhood related to C-2, rather than C-3 zoning. In this regard, however, he testified that many of the multitude of uses permitted under C-3 zoning would also be incompatible with the nearby residential areas, although he could not say that every such permitted use would be incompatible.[8]

Following Mr. Blumberg was Harry Simms, appellant's owner. Mr. Simms said that, based upon oral conversations with representatives of three financial institutions, he did not believe that he would be able to obtain financing for residential development of the subject property, but that he might be able to obtain financing for commercial development. He acknowledged that he had made no formal applications for residential financing, and thus had received no formal rejection; but he expressed the belief that although not impossible, it was not economically feasible to build houses on the lots.

The final witness — Mr. Bohorfoush — was a real estate manager for B P Oil Co. It was from his testimony that the record first reveals the actual proposed use of the property

---

8. The relevant colloquy was as follows:

"Now, your basic statement was pretty clear to me, Mr. Blumberg, that basically your opinion and the staff's opinion was that any commercial use is incompatible with the rest of the neighborhood on that site property. I was very clear on that.

"Now, do you specifically recall whether or not you went through each and every use within the C-3 zone and made a determination of compatibility, or did you — the way I read it, you just said that any commercial use at this property is incompatible and that's all there is to it. That was the way I understood you. Now, am I correct or incorrect?

"A I would have to say that you were correct, yes. We did not go down the list and make a determination on each of the 30, 40 uses in the C-3 zone which are permitted and make a determination for each of those." (E. 66-67)

if the C-3 zoning were granted — a "gas and go" service station. Mr. Bohorfoush said that market studies made by BP indicated that this would be a good spot for a service station, in part because there were few such stations along the west side of Georgia Avenue. He acknowledged that one of the reasons for this was that there was very little commercial zoning on that side of Georgia Avenue.

The hearing was then adjourned until June 20, 1973, at which time a number of additional documents were admitted into evidence, and appellant's expert — George Bushby — testified. One of the documents was a letter from Mr. Blumberg stating, among other things, that the site "is developable in the C-3 zone." Another was a memorandum from the county Department of Transportation concluding, with respect to this property:

> "Traffic Generation of an auto service station is minimal when compared to current peak hour volumes. Operational difficulties would only be experienced in relation to northbound left turns operating without benefit of a left turn storage lane. Although a service station at this location is not likely to generate much northbound traffic it is possible that other uses permitted under C-3 zoning would. Some examples are:
>
> a) car wash
> b) drive-in banks
> c) recreational facilities
> d) theaters
> e) etc.
>
> "Any land use that is likely to 'back up' traffic in the manner of the above listed uses could cause severe operational difficulties at this location."

Mr. Bushby, a land surveyor, testified that (1) he was familiar with the neighborhood, (2) he examined the property in question, and (3) he was aware of appellant's intent to construct a gasoline station and examined the site solely with

that in mind.[9] He concluded that development of the property as a service station could be handled from an engineering point of view, if properly designed and constructed, and that "that use" would have no adverse effect on the community.

The essence of Mr. Bushby's testimony was that a service station would be compatible with the character of the neighborhood, as he defined it, and also with the purpose of C-3 zoning. By taking into account the commercial development on the other (east) side of Georgia Avenue (a 6-lane highway divided by a median strip), Bushby concluded that C-3 zoning on this site would permit an orderly grouping and spacing — *i.e.,* a clustering — of commercial uses, which is consistent with the intent of the C-3 zone. In answer to the Hearing Examiner's inquiry as to whether such compatibility could be assured with respect to any other C-3 use (any use other than a service station), Mr. Bushby indicated that such a determination could be made in the context of later *site-plan* approval.

Upon all of this, the Hearing Examiner again recommended that the District Council reject the application. He concluded first that reclassification of this property would *not* be compatible with C-3 zoning. The Code language speaking of grouping and spacing of commercial development referred,

---

9. The relevant inquiry on this point was as follows:

"EXAMINER ABRAMS: Now, you stated that you examined the site from the standpoint of only the operation of a service station, is that correct?

"THE WITNESS: That's correct.

"EXAMINER ABRAMS: Now, you know that we don't have conditional zoning in the county and we can't advise the applicant to putting in a service station as opposed to a heavy equipment operation.

"THE WITNESS: That's right.

"EXAMINER ABRAMS: Now, why did you examine it from the standpoint of the zone because we are not, today, in a special exception hearing for a gas station. We are looking at the uses within the zone. So how come you didn't approach you [sic] analysis from that standpoint?

"THE WITNESS: Because I was told by Mr. Lowe and BP that they wanted to buy the site, that they felt it was a good site for a service station and would I look at it from that point of view, and that is why I restricted it to the service station activity."

he thought, to development on the site itself in conjunction with those properties abutting it — not in relation to uses across such a formidable barrier as Georgia Avenue. He agreed with the technical staff report that the size and location of the subject site militated *against* compliance with the purpose of C-3 zoning; not only would commercial development of this property fail to minimize interference with through traffic movements, but it might encourage a string of small commercial developments along the west side of Georgia Avenue. The essence of his conclusion was that the property was too small to permit the type of clustering of commercial uses envisioned by C-3 zoning, and that a service station, in any case, was more of a "free standing" use that did not lend itself to being incorporated into other types of clustered commercial uses.

Also in connection with the issue of compatibility, the Hearing Examiner rejected Mr. Bushby's definition of the relevant "neighborhood". He felt that Bushby had been much too restrictive, excluding the nearby residential areas to the west and south of the property (on the west side of Georgia Avenue) but including the commercial developments on the east side of that artery. In view of the close proximity of single family dwellings, the Examiner did not believe that site-plan review would suffice to screen the effects of commercial development of this site, and thus concluded that the proposed reclassification would not be harmonious with existing and planned land uses in the surrounding area.

A second basis for the Examiner's recommendation was that the proposed reclassification would be inconsistent with the Kensington-Wheaton Master Plan. Acknowledging that the plan was a "dated" one — it was adopted in 1959 — and that there had been many deviations from it, the Examiner noted that most of those deviations were on the east side of Georgia Avenue, and that the west side of the street had been developed in conformance with the Plan. Moreover, he observed that, based upon more recent planning guidelines adopted by the County Council (the most recent having been in 1968), the 1959 Master Plan still had vitality.

Finally, although acknowledging that a service station

would not likely cause significant traffic problems, the Examiner noted that the evidence (particularly the letter from the Department of Transportation) showed that other C-3 uses could cause such problems. Thus, he cautioned:

> "It is perhaps appropriate to once again express the caveat that the question of traffic impact should be judged not from any specific development proposed by the applicant but the nature, character and potential intensity of a reasonable cross section of development which would be permitted under the C-3 Zone. To do otherwise may well place an unwarranted aura of conditional zoning which is an impermissible consideration."

Upon this basis — *i.e.,* considering a "cross section" of the possible uses permitted in a C-3 zone and not just a service station — he concluded that such zoning, with its "myriad of vehicular oriented business uses" would not be in the public interest.

The Hearing Examiner's report was sent to the District Council which, after "reviewing the evidence of record", agreed with his findings, conclusions, and recommendations. Specifically, by Resolution adopted November 20, 1973, the Council concluded that the reclassification would not be compatible with the "purpose clause provisions of the C-3 Zone", or with existing and planned land uses in the area. It determined, as well, that the rezoning would not be in conformance with the Kensington-Wheaton Master Plan (noting, in that regard, that those parts of the plan pertaining to the residential character of the area west of Georgia Avenue "have, with minor exception, been effectuated and maintained") and that it would not be in the public interest "due to potential problems of traffic safety and congestion."

Appellant challenged each of these findings — incompatibility with the purpose of C-3 zoning, with the neighborhood, and with the Master Plan and the potential traffic problems — in its appeal to the Circuit Court. Upon a plethora of pleadings and after a hearing in open court, the court concluded that the matter should be remanded "for

further evidence in connection with the traffic study that was conducted", noting that the evidence "in this regard is confusing, conflicting, and inclusive [sic, inconclusive]". As a result, it stated:

> "Based upon this record, the Court cannot conclude, as did the County Council, that the requested reclassification would not be in the public interest because of potential traffic safety problems. *Having concluded as we have, it is not necessary that the Court consider the other contentions raised by the Appellant in this Appeal."* (Emphasis supplied.)

The case thus wound up, once again, before the Hearing Examiner, who conducted what amounted to the fourth hearing — the second at which testimony was taken. Two witnesses testified — Stephen Lawlor, a Senior Transportation Planner with the Maryland-National Capital Park and Planning Commission, and Stephen Petersen, a traffic planning engineering consultant. Lawlor identified, and supported, a written report prepared by him on behalf of the Commission which recommended denial of the application because:

(1) The C-3 zoning would permit "certain high trip generating uses, such as a drive-in bank, a carwash, a drive-in restaurant, a theater, et cetera" and that "[t]rip volume activities of this type would be highly undesirable at this location";

(2) The lack of a northbound left turn storage lane at the intersection coupled with the presence of a "high trip generating activity" would "significantly reduce the northbound Georgia Avenue traffic flow capacity"; and

(3) The proximity of the Weisman and Shorefield Road intersections, the lack of signalized control at Weisman Road, and the high percentage of westbound left turns from Shorefield Road combine to produce a hazardous situation for northbound left turn movement into Weisman Road, and an increase in the number of vehicles making this maneuver (to get onto the subject property) "would magnify the safety problems at this intersection."

Mr. Lawlor stated that, in doing a traffic study for purposes of zoning, as opposed to site-plan approval, the Commission is required to investigate the possibility of any of the permitted uses to which the property may be put — "you really don't have at that point, any commitment, any specific proposals in regard to zoning."

Mr. Petersen expressed his disagreement with many of Mr. Lawlor's conclusions. Underlying much (though not all) of his disagreement was his belief that many of the potential problems pointed out by Mr. Lawlor could be resolved through the site-plan or subdivision approval process, and certain modifications to Georgia Avenue itself, and would therefore never become real problems. Much of the dispute related to whether the commercial development of the property under C-3 zoning would so increase the number of vehicles attempting to make left-hand turns from the northbound lanes of Georgia Avenue onto Weisman Road as to cause back ups on Georgia Avenue. At issue was whether the traffic signal at Shorefield Road, some 80-100 feet north of this intersection, would create sufficient gaps in the southbound traffic to allow the left turns to be made without creating a back up, or, if it did not, whether a left turn storage lane would be needed at Weisman Road.

Though taking issue with the court's failure to consider the more fundamental reasons for the initial rejection of the application, the Examiner nevertheless again recommended rejection, solely upon the traffic issues. He concluded that the evidence failed to show that the signal at Shorefield Road would create a sufficient gap time to prevent safety and traffic flow problems "which would be inherent without a left turn storage lane at the Weisman Road intersection." Thus, he said, "approval of the requested reclassification would not be in the public interest due to identified problems involving traffic safety, congestion and impediments to traffic circulation and flow. . . ."

The matter was once again before the District Council, which again accepted the Examiner's recommendation and rejected the application. Recalling not only the evidence

presented at the most recent hearing, but also the studies prepared by the county Department of Transportation and the Park and Planning Commission that were presented at the earlier proceeding, the Council concluded that the evidence "appears to be not only substantial but overwhelming" that because of the various potential traffic problems found by the Examiner, the proposed reclassification would not be in the public interest.

Back again the matter went to the Circuit Court, but this time the court concluded that the traffic studies had been "exhaustive", that the reasons assigned by the various expert witnesses were "logical and meaningful", that the issue as to traffic safety was fairly debatable, that the record did not support the allegation that the Council's action was arbitrary or capricious, and that the doubts had by the court with respect to the original traffic studies "have been totally abolished by the new evidence". Thus, the court affirmed the Council's action, without ever passing on anything but the traffic issue.

### Status of the Case Vis-à-Vis Appellate Review

The District Council gave four independent reasons for denying the rezoning in November, 1973, and each of them was presented to and argued before the Circuit Court in the initial appeal. There is some confusion in the record, however, as to whether the court ever addressed and decided anything other than the fourth issue — that dealing with potential traffic problems.

Appellant suggests, as a "fair reading" of the court's action, that the court did, in fact, consider all four reasons cited by the Council and that it concluded that only one of them — the potential traffic problems — was supported by sufficient evidence to make the issue fairly debatable. Thus, it seeks to limit our review to that one issue, asking, as noted, whether these potential traffic problems, *standing alone,*

suffice to support the Council's denial of the application.[10] Although the record is somewhat confusing as to whether the court did or did not consider and decide the more basic issues — at one point the court stating that it would not consider them and at another point seeming to indicate that it had considered and decided them in appellant's favor — it appears to us more reasonable to suppose that the court had, in fact, declined to consider the other three reasons, that its very brief subsequent comment was perhaps a careless inadvertence rather than the announcement or affirmation of a substantive decision on such important issues. In any event, for purposes of this appeal, it is quite irrelevant whether or not the court decided those issues.

Where multiple issues are properly presented to the trial court, the fact that the court rests its decision upon only one of those issues and declines to decide the others does not necessarily withdraw from appellate review the undecided issues. Maryland Rule 1085; *Mont. Co. v. Md. Soft Drink Ass'n,* 281 Md. 116, 122 (1977), and cases cited therein. This is especially true in a case such as this, where the relevant inquiry does not involve initial fact-finding by the court but only questions of law and of the sufficiency of evidence before an administrative tribunal. Thus, if, as the county contends and as we think the record as a whole indicates, the court did not decide these other issues of compatibility, that omission does not withdraw them from consideration on appeal. If, as *appellant* suggests, the court *did* decide those issues by concluding that there was insufficient evidence before the District Council to sustain its determination as to

---

10. Appellant draws some support for its contention from the following colloquy occurring at the commencement of oral argument before the court in the second appeal:

"[MR. LOWE] I'm not exactly sure what posture we're in, in that it occurred to me that perhaps Your Honor got over at the last hearing, got over those four hurdles and was concerned that the case had not been commented on by the Traffic Department at the Planning Commission.

"THE COURT: Right.

"MR. LOWE: Well, then I take it the sole surviving issue before Your Honor then is as it relates to the traffic question."

There was no response from the court to this last remark.

them, this appeal also presents for our review the correctness of that decision. Accordingly, in either case, we are not limited to a consideration solely of the traffic issue, but may, and shall, review the action of the District Council in terms of all of the findings and conclusions made by it and thus upon the record as a whole. For that reason, the first question, as framed by appellant, is an inappropriate one, and we shall not consider it as so framed.

### *Permissible Scope of Inquiry*

The basic disagreement between the parties is over what burden appellant possesses at the zoning stage to establish that the zoning it seeks is a proper one to be granted. Appellant's argument, essentially, is that: (1) in authorizing a "floating" zone, the legislative body has predetermined that the uses permitted in that zone are not legally or inherently incompatible with the environment in which they may be placed; (2) therefore, once an applicant has demonstrated a desire and ability to develop the property for *any* of the permitted uses, his application cannot be denied unless the zoning authority finds that there is an *actual* incompatibility with respect to *that particular use* or that *such use* does not comport with the purpose of the zone. In effect, appellant is saying that, because it desired to develop the subject property as a service station, it was only obligated to establish that *that* use is a compatible one, and was not required to prove that all other uses permitted in the C-3 zone are also compatible.

The county, on the other hand, recognizing its own ordinance forbidding conditional or contract zoning,[11] contends that it could not have limited appellant to developing the property for a service station. Thus, if the C-3 zoning had been granted, subject only to subsequent site-plan approval, appellant, or its grantees, would have been entitled to develop the property for any use permitted by C-3 zoning. For that

---

11. *See* Montgomery County Code, § 59-H-6.4: "No application for a local map amendment shall be approved conditionally for the erection on the land of a structure at a particular location, or within a particular time, or by a particular person, or of a particular type, or for the subdivision of the land in a particular manner or on any other condition."

reason, it says, the zoning authorities must consider the question of compatibility in the context of *all* of the permitted uses, and not just the one currently proposed by the applicant.

Under the law that existed at the time of these proceedings before both the District Council and the Circuit Court, it was not entirely clear what burden an applicant had to carry at the zoning stage. As noted earlier, C-3 zoning permits a wide variety of uses, some of which, notwithstanding their general or potential permissibility, would be wholly inapplicable to this property under any circumstance. This property — 20,000 square feet — could not, for example, be used as a stadium or a fair ground or an amusement park, or a golf driving range, all being permissible uses under C-3 zoning, even if the C-3 zoning were granted. But its potential for development under many of the other uses authorized in a C-3 zone certainly could not be foreclosed, at the zoning stage, solely because of the physical characteristics of the property itself.

Thus, on the one hand, it would be ludicrous to require an applicant to establish the compatibility of uses that, in fact, are incompatible and to which the property could never be put, as a condition of obtaining the zoning necessary to develop the property for a permitted use that is not incompatible. But, so long as the applicant is not (and could not be) bound to develop the property for any particular use, it was relevant, and necessary, for the District Council to consider the application in the light of all those uses to which the property could reasonably be put, and not just the one currently desired by the applicant. This is especially true in light of the fact that that particular use required a special exception and would not, therefore, have been authorized by the mere granting of C-3 zoning.

In the instant case, we find no error in the criteria applied by the Hearing Examiner and the District Council. They viewed the application in terms of those uses to which the property could reasonably have been put if the requested zoning were granted; and, in doing so, they imposed no unreasonable burden upon the applicant.[12]

---

12. In June, 1978 — after the proceeding in the Circuit Court had been concluded — the District Council adopted an ordinance adding new

Appellant's contention that the requirement of site-plan approval serves, in some way, to circumscribe the scope of relevant inquiry by the District Council in acting upon an application for rezoning is wholly without merit. Although there is obviously some overlap in terms of the relevant factors to be considered in each proceeding, the overlap is by no means complete. The fact that, in a proceeding for site-plan approval, the county planning board must consider whether the particular proposed use is compatible with the requirements of the zone and with the surrounding neighborhood does not limit the ability — indeed the responsibility — of the District Council, a superior legislative body, to consider the full potential effects of granting a zoning reclassification. The Council cannot predict what the planning board will do with respect to each of the many different types of site plans that could be proposed under C-3 zoning; and even if it could, it would have no power to delegate its own responsibility under the law to a subordinate administrative body to be exercised in the context of a substantially different type of proceeding.

Accordingly, under the law governing these proceedings, the Council was entitled to consider, in the context of *any* of the uses to which this property could reasonably be put under C-3 zoning, whether such uses (and therefore such zoning) comported with the purpose of C-3 zoning, whether they would be compatible with the Master Plan and with the surrounding neighborhood, and whether they were in the public interest.

---

§ 59-H-2.4A to the County Code. This permits an applicant for a local map amendment in the C-3 zone to submit a "schematic Development Plan" limiting the applicant's land use to "one or more" of the permitted uses in the zone, as part of the rezoning application. It provides further that approval by the Council "shall not be for a manner of development or use other than that for which has been applied." This new ordinance, which supersedes the section of the Code prohibiting conditional zoning, would seem to permit an applicant to specify the use or uses he wants, and to permit the Council, in effect, to limit him to that which he requested. This would, in turn, permit the application to be considered solely in the context of the particular use or uses requested. This new ordinance, if valid, appears to resolve many of the uncertainties and problems that underlie the issues raised by appellant. Indeed, appellant may wish to take advantage of the new ordinance in any future proceeding with respect to the property.

### Sufficiency of the Evidence

Having concluded, in effect, that the issues raised and considered by the Council were properly before it, we look now to see if there was sufficient evidence in the record to make its resolution of those issues fairly debatable, that being the permissible scope of *our* inquiry. The question, then, is whether a reasoning mind could reasonably have reached the result the Council reached upon a fair consideration of the fact picture painted by the entire record. *Agneslane, Inc. v. Lucas,* 247 Md. 612 (1967), and cases cited therein.

Extended discussion is unnecessary. The testimony of Mr. Blumberg and Mr. Lawlor, coupled with the reports of the Commission's technical staff and traffic division, the planning board, and the county department of transportation provided a clear and sufficient basis to support the findings of the Hearing Examiner, and thus of the District Council on all of the issues before the Council.

Although the law creating and describing the C-3 zone does not exclude lots of this size, the relatively small area of this property was certainly relevant to a determination of whether a reclassification would be consistent with the purpose of the C-3 zoning. While some of the potential uses, including that desired at the time by appellant, are "related to the traveller and highway user" and thus not wholly foreign to the intent of the C-3 zone, there was ample evidence before the Council from which it could reasonably have concluded that the requested reclassification would not "provide a method for the orderly grouping and spacing of commercial development" on properties abutting major highways or on properties recommended for such zoning in a master plan. Nor would the attachment of C-3 zoning on this property provide a site "for commercial activities that may require large land areas and do not depend upon adjoining uses. . . ."

That commercial use of this property would be inconsistent with the applicable Master Plan was not seriously disputed, and, notwithstanding that the plan was somewhat dated, the Council (the body that adopted the plan) cannot be said to have erred in considering that part of the plan particularly

applicable to this property to remain viable and in thus giving weight to the inconsistency. The Council was not obligated to accept Mr. Bushby's restricted definition of the relevant neighborhood, but was entitled to consider the effect of any of the reasonably potential commercial uses upon the residential area to the west of Georgia Avenue, and to conclude from the evidence before it that some (or perhaps all) of those uses would, in this context, be discordant ones.

Finally, as to traffic, the Council had abundant evidence before it to establish that, absent construction of a left turn storage lane on Georgia Avenue, considerable traffic problems (both in terms of safety and possible obstructions) might develop from an increased frequency of left turns into this property. Appellant made no effort to show that such a left storage lane would, in fact, be constructed, and the Council was obviously not obliged to assume that it would be. The testimony of Mr. Bushby on the traffic question assumed development as a service station and did not take into account the other possible uses to which the property might be put if the application were granted. His testimony, therefore, was limited in scope and did not even address some of the concerns expressed by the public agencies.

From the record as a whole, we believe that the conclusions reached by the District Council that led it to reject the application were fairly debatable.

*Judgment affirmed; appellants to pay the costs.*